By the Court, Beardsley, J.
The plaintiffs insist, among other things, that the plea of the general issue admits them to be a corporation, and therefore superseded the necessity of proving their corporate existence on the trial of the cause. This counter objection, in avoidance of the point raised on the part of the defendant, is founded on the statute which declares that, “ in suits brought by a corporation created by or under any statute of this state, it shall not be necessary to prove on the trial of the cause, the existence of such corporation, unless the defendant shall have pleaded in abatement or in bar, that the plaintiffs are not a corporation."’ (2 R. S. 458, § 3.)
But this enactment has no application to the present case. In ejectment the defendant cannot plead in abatement or in bar that the plaintiffs are not a corporation, as he may do in most other actions, but is confined to the general issue. (2 R. S. 306, § 22.) The enactment on which the plaintiffs rely, moreover, is in terms restricted to “ suits brought by a corporation created by or under any statute of this stateand it is always open to inquiry, as a question of law, whether the plaintiff, prosecuting as,such corporation, was or could have been created by or under any such statute. Corporations are-sometimes created ipso facto, et eo instanti, by the mere passage of a statute; but more frequently the statute declares and points out the mode in which the legal body may thereafter be brought into existence. It is to corporations of the latter class, and to actions in which the plea of nul tiel corporation may be pleaded, that the statute applies; but it is wholly inapplicable to the present case.
It is urged on the part of the plaintiffs, that they were created a corporation by the patent given in evidence on the trial, and which was issued in 1676, by Edmund Andross, who is therein *503 described as “ Seigneur of &c., Lieut, and Governor Gen’l under his Royall Highness, James, Duke of York and Albany &e., of all his terrytoryes in America.” This patent, after reciting that there is a town on Long Island called and known by the name of Southold, “ having a certain tract of land thereunto belonging,” [describing it,](a) proceeds as follows: “Now for a confirmation unto the present freeholders inhabitants of ye sd town and precints, Know ye that by virtue of his majestie’s letters pattants and the comission and authority unto me given by his Royall Highness, I have ratified, confirmed and granted, and by these presents doe hereby ratify, confirm and grant, unto Isaac Arnold, justice of ye peace, Capt. John Young, Joshua Horton, constable, and Barnabas Horton, Benjamin Youngs, Samuel Glover and Jacob Corey, overseers, as patentees, for and on behalf of themselves and there associates, the freeholders and inhabitants of ye sd town, their heirs, successors and assigns,” the said land in said patent, to have and to hold, the said land, “ to the sd patentees and their associates, their heirs, successors and assigns, to ye proper use and behofe of ye sd patentees and their -associates, their heirs successors and assigns forever;” the tenure to be “ in free and common socage and by fealty only; provided always &c., that all the sd lands and plantations within the sd limitts or bounds shall have relation to ye town in general! for the well government thereof; and if it shall soe happen that any part or parcell of sd lands &c. be not already .purchased -of ye Indians- it may be purchased (as occasion) according to law.” The patent also confirmed and granted unto the said “ patentees and their associates, their heirs, successors and assigns, all the privileges and immunities belonging to a town, within this government, and that the place of their present habitation and abode shall continue and retain ye name of Southold, by which name and stile it shall be distinguished and known in all bargains and sales, deeds, records and wrightings, they making improvement on the said land and conform *504 ing themselves according to law, and yielding and paying therefore yearly and every yeare unto his Eoyall Highness’ use as a quitt rent one fat lamb unto such officer and officers there in authority as shall be empowered "to receive the same.” It was admitted on the trial that the lands in controversy were part of the premises described in said patent.
It is deemed unnecessary, as the case is now presented, and would be out of place, to attempt any explanation of the true meaning and effect of this patent from Governor Andross. The effect of it may have been to confer on the town of Southold corporate powers, and to invest it with an absolute right and title to these lands. But upon this, no opinion is intended to be expressed. It is enough at present to say, the patent furnishes no ground whatever for holding that such a corporation as the plaintiffs claim to be was thereby created. The declaration alleges that they were incorporated by an act of the legislature of this state, and it was necessary to prove the averment.
Were the plaintiffs created a corporation by the act of April 8th, 1796 ? This act has "reference to the “ common and undivided lands and meadows in Southold,” and was manifestly framed and enacted upon the supposition that these lands and meadows were owned by individual proprietors, and not by the town in its corporate capacity and character. It recites that said' “ proprietors” had petitioned the legislature—not that the town of Southold had done so—and that by their petition they “ requested legislative aid to enable them more advantageously to improve their said lands and meadows.” It then proceeds to authorize “ the said proprietors to meet on the second Tuesday of April next, at the house of Moses Case, and annually thereafter on the second Tuesday in April, at such place as a majority of them shall directand it declares that the proprietors, or a majority of them so assembled, may make “ such prudential rules and regulations for the better improving and managing their said common and undivided lands and meadows, as they shall judge properthat they may “elect three trustees to have the superintendence and management of their said lands *505 and meadows, according to such rules and regulations as aforesaid to be made at such meetings;” that the trustees “may sue for and recover, for the use of the said proprietors, all such penalties as shall be made for the breach of the said rules and regulations ;” that special meetings may be called by the trustees; and that the votes of the proprietors, at their meetings, shall “ be counted according to the number of rights owned by each proprietor who shall vote,” &c. (3 Greenl. Laws of N. Y. 330.)
The act assumes that the proprietors of these lands and meadows were tenants in common, having title to different shares and proportions thereof; and it leaves the title as it previously existed, in the individual proprietors. They were probably quite numerous, so as to make it inconvenient for them all to attend to whatever might concern their common interest in the management of this property; and therefore they asked legislative aid, not to make the owners a corporation, and transfer these common lands to the new body to be created, but “ to enable them,” as the act declares, “ more advantageously to improve their said lands and meadows.” This is all the proprietors desired, and it is all the act provides for. They were authorized to “ elect three trustees to have the superintendence and management” of the property, “ according to such rules and regulations” as should be made at the meetings of the individual proprietors. These rules and regulations were to be “ for the better improving and managing” of “ said common and undivided lands and meadows,” and could have no bearing whatever upon the title to the property. Nor indeed has the act, in any of its provisions, so much as a single feature which looks to the transfer of title from the individual owners to a legal person created by the act. There was apparently no necessity for the creation of such a legal entity, or for the transfer of title to any one. The proprietors, in asking legislative aid, looked only to “ the better improving and managing” of their property; and the mode in which this was to be effected was by the election of trustees who were “to have the superintendence and management” of the property, the title remaining, as before, in the individual owners thereof.
*506 It must be admitted that these lands and meadows were by this act subjected to peculiar legal provisions, in many respects, variant from those which usually apply to lands held in common. The power to improve and manage the common property was vested in a majority in interest of the owners, when legally convened, to be exercised through the agency of trustees elected from time to time: whereas the general law requires an entire unanimity on the part of the several owners to effect the same objects. Peculiar reasons must have existed for the passage of such' an act, but with these we have no present concern. And as the act appears to have been passed on the “petition” of the several proprietors, and consequently with their concurrence and consent, it was undoubtedly within the limits of the constitutional power of the legislature. This, however, need not be determined here. The plaintiffs claim that the act is valid. If, on the other hand, it is void, their case falls with it. But assuming its validity, we are unable to perceive that it makes the plaintiffs a corporation, or gives them any capacity to sue. The motion for a nonsuit should therefore have been granted, and the defendant is entitled to a new trial.
New trial granted.

‘(a) For the description, see Thompson's History of Long Island, Vol. I. p. 385.